IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| Terrence Brown and | § | |
| Lastasha Jones, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| vs. | § | Civil Action No. 6:22-cv-122 |
| | § | |
| Mazda Motor Corporation and | § | |
| Mazda Motor of America, Inc., | § | |
| | § | |
| *Defendants*. | § | |

## PLAINTIFFS' COMPLAINT

**To the Honorable Judge of Said Court:**

COME NOW, Terrence Brown and Lastasha Jones (hereinafter referred to as "Plaintiffs"), and respectfully file this Complaint against Mazda Motor Corporation and Mazda Motor of America, Inc. (hereinafter referred to collectively as "Mazda"), and in support hereof would state and show the following:

## I. Parties

1. Plaintiff Terrence Brown is the biological father of J.E.J., a deceased minor.

2. Plaintiff Lastasha Jones is the biological mother of J.E.J., a deceased minor.

3. Defendant, Mazda Motor Corporation, is a Japanese corporation doing business in Texas, and service of process upon this Defendant may be had by serving its president, Masamichi Kogai, at 3-1 Shinchi, Fuchū, Aki, Hiroshima, Japan.

4.     Defendant, Mazda Motor of America, Inc., is a California corporation doing business in Texas, and service of process on this Defendant may be had by serving its registered agent for service, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

## II. Jurisdiction

5.     This Court has jurisdiction over the lawsuit under the provisions of 28 U.S.C. § 1332.

6.     The parties to this lawsuit are citizens of different states, and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

7.     Mazda Motor Corporation is a multi-national, multi-billion-dollar corporation that designs, develops, manufactures, assembles, markets and sells automobiles, and related component and replacement parts in Asia, Europe, North America, and internationally. North America is Mazda's biggest market.

8.     Mazda Motor Corporation began selling its vehicles and powertrains in the United States in the 1970s.

9.     Mazda Motor Corporation products include cars and motor vehicles, automobile engines, transmissions, and press parts. These products are distributed throughout North America, including the United States, and including Texas.

10.     For years, and up until the present date, Mazda Motor Corporation has been aware/is aware that thousands upon thousands of its vehicles and other products were (and are) arriving in Texas through the stream of commerce and being sold in Texas.

11. Indeed, for years, Mazda Motor Corporation was (and is) aware that thousands upon thousands of its vehicles and other products were (and are) arriving in Texas through other states.

12. Furthermore, Mazda Motor Corporation is aware that it has end users of its vehicles and other products located in Texas.

13. Mazda Motor of America, Inc. is the distributor for Mazda Motor Corporation vehicles and other products. Mazda Motor Corporation is aware of the distribution system's operation, and Mazda Motor Corporation knows that it benefits economically from the sale in Texas of Mazda Motor Corporation vehicles and other products.

14. Mazda Motor Corporation could, if it wanted to, instruct Mazda Motor of America, Inc. to refuse to ship vehicles and other products to Texas. However, Mazda Motor Corporation, has never, in any way, shape, or form, restricted the Subject Vehicle model which caused the fatal injuries complained of herein from being distributed, sold, or used in Texas, nor has Mazda Motor Corporation, ever, in any way, shape, or form, restricted any of its vehicles or products that it designs, manufactures, or distributes from being distributed, sold, or used in Texas.

15. Thus, it is clear that Mazda Motor Corporation's vehicles and other products arrive in Texas either through direct shipment or through the stream of commerce and that Mazda Motor Corporation is aware of this fact.

16. Mazda Motor Corporation also knows that there are consumers who are looking for Mazda Motor Corporation vehicles and other products in Texas, and Mazda

Motor Corporation helps them buy vehicles and other products in Texas by providing them with information about their vehicles and products.

17.   Mazda Motor Corporation spends at least hundreds of thousands, if not millions, of dollars per year marketing its products, including the subject vehicle. Indeed, for many years up until the present, Mazda Motor Corporation has made, approved, and/or distributed advertisements or commercials or other marketing materials touting the safety of Mazda Motor Corporation vehicles and how much Mazda Motor Corporation supposedly cares about safety.

18.   Advertisements and marketing materials were and are targeted to United States consumers, including Texas residents, to entice them to purchase Mazda Motor Corporation vehicles, including the subject model vehicle.

19.   Mazda Motor Corporation made, approved, and/or distributed these types of materials to entice consumers and ultimate users, including those in Texas, to (1) purchase Mazda Motor Corporation vehicles—whether used or new; (2) to drive Mazda Motor Corporation vehicles—whether used or new; and (3) to ride in Mazda Motor Corporation vehicles—whether used or new.

20.   Mazda Motor Corporation knew that American consumers—including consumers in Texas—would rely upon its statements when deciding whether to purchase a Mazda Motor Corporation vehicle, whether to drive a Mazda Motor Corporation vehicle, or whether to ride in a Mazda Motor Corporation vehicle.

21.   On the Subject Vehicle, Mazda Motor Corporation affixed a sticker wherein Mazda Motor Corporation affirmatively represented to consumers that, "[t]his vehicle

conforms to all applicable federal motor vehicle safety and theft prevention standards in effect on the date of manufacture".

22.   Based upon information and/or belief, the Subject Vehicle did not meet all Federal Motor Vehicle Safety Standards (FMVSS).

23.   Mazda Motor Corporation is currently in exclusive possession and control of all the technical materials and other documents/material regarding the design, development, manufacture, assembly, engineering analysis, and testing of the subject vehicle.  In the past, Plaintiffs' counsel has worked on several other vehicle product liability lawsuits in Texas and elsewhere against Mazda Motor Corporation, and counsel have seen Mazda Motor Corporation confidential documents and learned other information regarding Mazda Motor Corporation and its vehicles.

24.   In those other cases, Mazda Motor Corporation took the position that all the technical materials and other documents/material regarding the design, development, manufacture, assembly, engineering analysis, and testing of the subject vehicle were confidential and/or proprietary, and Mazda Motor Corporation insisted that it would not produce such materials without a protective order, which would contain language that counsel had to either return the material or destroy the material at the conclusion of litigation.

25.   Based upon information and/or belief obtained from those other cases, employees, officers and/or directors of Mazda Motor Corporation have visited, lived, conducted business, and/or worked in Texas.

26.   Based upon information and/or belief obtained from those other cases, Mazda Motor Corporation also monitors its vehicles, such as looking at customer complaints or feedback from distributors and dealers, including many in Texas.

27.   Based upon information and/or belief obtained from those other cases, Mazda Motor Corporation has, in the past, entered into contracts with other individuals or entities located in the State of Texas, and/or where performance of the contract was to take place in the State of Texas.

28.   Based upon information and/or belief obtained from those other cases, Mazda Motor Corporation keeps records of the revenue that it derives from the State of Texas.

29.   Mazda Motor Corporation holds patents and trademarks which it demands must be honored in Texas.

30.   Mazda Motor Corporation provides a warranty for certain Mazda vehicles, including vehicles in Texas, and Mazda Motor Corporation will reimburse Mazda Motor of America, Inc. for warranty costs.

31.   Mazda Motor Corporation routinely corresponds and works with the National Highway Traffic Safety Administration (NHTSA) on recalls and other issues, including recalls or fixes to problems for vehicles owned and used by Texas residents.

32.   Mazda Motor Corporation has appeared in other litigation—including product liability litigation involving its vehicles—in Texas and not contested personal jurisdiction, both in Texas state court and federal court.

33.   In 2015, in another case involving allegations of a defective vehicle in Texas, Mazda Motor Corporation did not contest personal jurisdiction and admitted that the United States District Court for the Northern District of Texas had jurisdiction over the matter.[1]

34.   In 2018, also in another case involving allegations of a defective vehicle, Mazda Motor Corporation did not contest personal jurisdiction by the a District Court of Tarrant County, Texas.[2]

35.   In 2019, in another case involving allegations of a defective vehicle in Texas, Mazda Motor Corporation did not contest personal jurisdiction.[3]

36.   Mazda Motor Corporation designs, manufactures, tests, assembles, sells, distributes, and places Mazda Motor Corporation model vehicles and their component parts into the stream of commerce, such as the Subject Vehicle involved in the incident made the basis of this suit.

37.   Mazda Motor Corporation placed the Subject Vehicle into the stream of commerce where it ultimately ended up in Texas.

38.   Mazda Motor Corporation knew that once it placed the vehicle into the stream of commerce, that there was a likelihood the car would wind up in Texas and/or be driven on Texas roads where it might be involved in an accident.

---

[1] *Paula Mendoza v. Mazda Motor Corporation*, Case No. 3:15-cv-01356-D, in the United States District Court for the Northern District of Texas, Dallas Division.

[2] *Jordyn Kledas v. Mazda Motor Corporation, et. al.*, Cause No. 067-299359-18, in the 67th District Court, Tarrant County, Texas.

[3] *Joshua Snead v. Mazda Motor of America, Inc. and Mazda Motor Corporation*, Case No. 4:18-cv-00805-ALM, in the United States District Court for the Eastern District of Texas, Sherman Division.

39.  The key elements of the episode-in-suit occurred in Texas.

40.  Mazda Motor Corporation has purposefully availed itself in Texas, and due process and fair play and substantial justice are honored by this civil action going forward in this Texas Court.

41.   There is little or no burden on Mazda Motor Corporation litigating this case in this Texas Court. In contrast, it would be a tremendous burden and great inefficiency and unnecessary delay imposed on the Plaintiffs to litigate this case in another forum because Texas has an interest in overseeing this litigation which involves injuries to Texas residents and defective products used in Texas.

42.  The efficient resolution of this civil action can only go forward in this Texas Court, and public policy favors resolution of this dispute in this Texas Court.

43.  Mazda Motor Corporation cannot deny personal jurisdiction because Mazda Motor Corporation placed the Subject Vehicle into the stream of commerce under circumstances such that Mazda Motor Corporation should reasonably anticipate being haled into court in Texas, where it has been many times before.

44.  Mazda Motor Corporation cannot deny personal jurisdiction because Mazda Motor Corporation placed the Subject Vehicle into the stream of commerce knowing full well that the Subject Vehicle—as well as hundreds if not thousands of other vehicles of the exact same model—could very well ultimately wind up in Texas and be driven by Texas residents on Texas roads, and that said vehicle(s) might be involved in an accident in Texas which might injure occupants of the vehicle.

45.   In short, Mazda Motor Corporation is in the business of the manufacture of vehicles, including the vehicle which caused the injuries complained of herein. Mazda Motor Corporation also derives substantial profit from the state of Texas.

46.   Mazda Motor Corporation, in no way, shape, or form ever restricted the vehicle, which caused the fatal injuries, from being distributed, sold, or used in Texas. Mazda Motor Corporation has purposefully availed itself of the privilege and benefits of conducting activities within Texas.

47.   Accordingly, Mazda Motor Corporation is therefore subject to be sued in Texas courts, and exercise of personal jurisdiction pursuant to Texas's long arm statute is, among other things, consistent with due process because Defendant has purposefully availed itself of the privilege of doing business in the forum.

### III. Facts

48.   On or about October 8, 2020, a minor child was the passenger of a 2011 Mazda 3 (VIN: JM1BL1UF0B1426403) ("Subject Vehicle").

49.   The Subject Vehicle was struck near the left front bumper by another vehicle at the intersection of FM 1995 and FM 314 in Van Zandt County, Texas.

50.   The initial strike then caused the two vehicles to side-slap causing the minor to strike his head against the interior of the Nissan vehicle.

51.   The side-curtain airbag deployed but its coverage area was too small, causing the minor's head strike. The injuries sustained ultimately proved to be fatal.

52.   The Subject Vehicle was designed by Mazda Motor Corporation and/or Mazda Motor of America, Inc.

53.   The Subject Vehicle was manufactured by Mazda Motor Corporation and/or Mazda Motor of America, Inc.

54.   The Subject Vehicle was marketed by Mazda Motor Corporation and/or Mazda Motor of America, Inc.

55.   The Subject Vehicle was also assembled by Mazda Motor Corporation and/or Mazda Motor of America, Inc.

56.   Despite being properly seated and properly wearing the available seat belt, the minor sustained catastrophic and ultimately fatal injuries when the Subject Vehicle failed to protect him because it violated several crashworthiness principles.

## IV. Crashworthiness Overview

57.   Crashworthiness is the science of preventing or minimizing injuries or death following an accident through the use of a vehicle's various safety systems.[4]

58.   There are five (5) recognized crashworthiness principles in the automobile industry/throughout the world. They are as follows:

    1.   Maintain survival space;

    2.   Provide proper restraint throughout the entire accident;

    3.   Prevent ejection;

    4.   Distribute and channel energy; and

---

[4] In any crashworthiness case, the distinction between the cause of an accident versus the cause of injuries is an important one. One of the best analogies is the case of the Titanic. While the cause of hitting the iceberg has been the subject of much debate (inattentiveness, the captain may have been drinking, they were going too fast, etc.), there is no question that every passenger which entered a lifeboat that night lived, while 99% of those who went in the water died. Accordingly, had the Titanic had enough lifeboats on board (i.e., the boat's "safety systems"), 100% of the people on-board would probably have lived. So, the cause of the sinking (the accident) is irrelevant vis-à-vis how everyone died. What's important is how the safety systems worked (or didn't work) following the accident.

5.    Prevent post-crash fires.

59.    When the National Highway Traffic Safety Administration (NHTSA) created the Federal Motor Vehicle Safety Standard (FMVSS) in the late 1960's, the preamble to the safety standards included a crashworthiness definition similar to that used above, "that the public is protected against unreasonable risk of crashes occurring as a result of the design, construction, or performance of motor vehicles and is also protected against unreasonable risk of death or injury in the event crashes do occur."

60.    The National Transportation Safety Board (NTSB) has also stated that, "Vehicle crashworthiness refers to the capacity of a vehicle to protect its occupants from crash forces. This protection—which is achieved, in part, by vehicle structure—includes maintaining a survival space around the occupant, retaining the occupant within that space, and reducing the forces applied to the occupant."

61.    Crashworthiness safety systems in a vehicle must work together like links in a safety chain. If one link fails, the whole chain fails. For example, in a rollover, if the roof collapses such that no survival space is left, it does not matter what kind of restraint system, glass, fuel system, or energy absorbing system is used, because these systems have been rendered moot.

## V. Duty to Make a Safe Vehicle

62.    For decades, automobile manufacturers have been telling the general public and others how important it is to make safe vehicles.

63.    For instance, in 1993, General Motors stated that "Safety isn't one thing. It's everything." Mary Barra, CEO of General Motors, testified to Congress in 2014 that,

"Our customers and their safety are at the center of everything we do." Jeff Boyer, Vice-President of Global Vehicle Safety at General Motors, has stated that "Nothing is more important than the safety of our customers in the vehicles they drive."

64.     General Motors has also stated in the past that, "The rich don't deserve to be safer … Isn't it time we realized safety is not just for the pampered and the privileged? Safety is for all."

65.     Ford has stated in the past that it is so obsessed with safety that only a person's mother is more obsessed with that person's safety than Ford.

66.     Ford has testified under oath that Ford "has a moral obligation to do those things that are feasible and practical to reduce the risk of injury and death to customers."

67.     Honda believes that safety is for everyone, including for other vehicle occupants and for pedestrians.



68.   In 2012, Volvo stated that "Technologies for meeting the goal of zero injuries and fatalities are basically known today – it is a matter of how to apply, finance, distribute and activate."

69.   Lee Iacocca, former President of Ford Motor Company stated, while President and CEO of Chrysler, that "Every American has the right to a safe vehicle." Gerald Greenwald, chairman of Chrysler, then sent a letter to every Chrysler dealership in 1988 stating that Chrysler intended to honor that right.

70.   Because every American has the right to a safe vehicle, because safety is for all, and because technologies for meeting the goal of zero injuries and fatalities are basically known today, it is incumbent upon auto manufacturers to investigate and find out what other automakers are doing with regards to safety and to apply those same methods or technology to their own vehicle.

71.   Furthermore, an automaker cannot choose to use safer technology in Europe, Australia, Japan, or some other country and refuse or fail to offer that same safety technology to consumers in America.

72.   It is further incumbent upon auto manufacturers to protect consumers by using knowledge that a manufacturer has acquired over decades and decades of vehicle design, testing, and reverse engineering of other manufacturers' vehicles.

73.   In fact, insofar as society permits vehicle manufacturers to operate in such a way that they are permitted to sell highly complex, potentially dangerous, and also potentially highly profitable products on the market, manufacturers have a duty to

do their very best to ensure that the vehicle will not be harmful to buyers, their households, or third parties.

74.   This is cemented by the fact that every state of the United States has case law which holds that every person has a duty to exercise reasonable care to avoid a foreseeable risk of injury to others.

## VI. Mazda and Safety

75.   For decades, Mazda has been telling the general public and others how important it is to make safe vehicles.

76.   Mazda has stated that when it comes to safety, you can never go too far, promising: "since drivers are human beings and human beings are fallible, Mazda offers a range of technologies which help prevent or reduce the damage resulting from an accident."

77.   Below is an advertisement wherein Mazda makes the comment that they have made every side of their vehicles safe:



## VII. Cause(s) of Action as to Mazda Defendants

*A. Count One: Strict Liability and Defective Design/Manufacture/Failure to Warn*

78.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

79.   Mazda Defendants (referred to in this Section simply as "Defendants") are in the business of designing, manufacturing, testing, assembling, marketing and/or distributing vehicles, including the Subject Vehicle.

80.   Defendants designed, manufactured, tested, assembled, marketed, and/or sold the Subject Vehicle that caused the fatal injuries to the minor child and Plaintiffs' damages.

81.   The Subject Vehicle was defective and unreasonably dangerous for its intended use.

82.   The Subject Vehicle was defective at the time it left Defendants' control.

83.   Reasonable consumers would not have been aware of the defective condition of the Subject Vehicle.

84.   Plaintiffs were not aware of the defects in the Subject Vehicle.

85.   The fatal injuries to Plaintiffs' minor son complained of herein occurred because the Subject Vehicle was defective and unreasonably dangerous.

86.   As detailed herein, the Subject Vehicle contains multiple design defects, Defendants have committed multiple acts of engineering negligence and they have created false, misleading and/or deceptive marketing intended to lure consumers.

87.   The Subject Vehicle was defective and unreasonably dangerous, the Defendants were strictly liable, negligent and Defendants misrepresented the safety of the Subject Vehicle in the following, non-exhaustive list of ways:

   a.   Defendants market themselves as the industry leaders in vehicle safety and testing;
   b.   Defendants market themselves as using state of the art engineering, testing and material, yet the facts prove otherwise;
   c.   Defendants claim in ads, marketing literature and commercials:
      i.   Everyone deserves to be safe;
      ii.   Safety is our main priority;
      iii.   Protecting you and your family is our foremost priority;
      iv.   Mazda uses state of the art safety systems to protect you and your family when accidents occur;
      v.   Mazda is the leader in developing and implementing occupant protection systems so that you and your family will walk away from an accident;
      vi.   Mazda has rededicated itself to restoring confidence in our brand, so we are going to have to build better and safer vehicles than anyone else in the world;
      vii.   One death is too many if we could have prevented the death.
   d.   The Subject Vehicle violated principles of crashworthiness;
   e.   The Subject Vehicle failed to provide proper restraint;

f.  The Subject Vehicle failed to contain a side curtain that offered full coverage to rear seated children;

g.  The Subject Vehicle failed to contain a side curtain airbag whose coverage extended well past the door;

h.  The Subject Vehicle contained a side curtain that had a huge lack of coverage in it so that if the rear seated occupant had moved forward at all due to prior impact, they would not be in a position to be protected by the inflated area of the side curtain;

i.  The Subject Vehicle failed to contain a side curtain airbag that offered full coverage like the 2014 Mazda series 3 series did;

j.  The Subject Vehicle failed to distribute injurious crash forces away from the cabin;

k.  The Subject Vehicle failed to utilize full coverage side curtain restraint systems that had been used in production vehicles since 2006;

l.  The Subject Vehicle was not subjected to proper engineering analysis such as FEA, FEM, finite element modeling;

m.  The Subject Vehicle was not properly tested;

n.  The restraint system was not properly tested;

o.  The Subject Vehicle and restraint system failed to provide reasonable occupant protection to children in the rear seat;

p.  The marketing material, ads and commercials were prepared at the direction of Mazda to entice consumers to buy Mazda vehicles;

q.  Consumers rely on the marketing material, ads and commercials when they buy a Mazda vehicle;

r.  Many of Mazda's marketing campaigns are not vehicle specific but talk about safety, testing, and engineering in general terms;

s.  Mazda failed to conduct rigorous engineering analysis to ensure vehicle safety and occupant protection;

t.  Consumers that purchase and operate Mazda vehicles expect Mazda to use state of the art safety, testing, and engineering considering Mazda's marketing campaigns;

u.  Mazda violated expressed and implied warranties about the safety quality of the vehicle; and/or

v.  The design defects, negligence, marketing defects, misrepresentations were the direct, producing, substantial and proximate cause of the fatal injuries to the minor child and the Plaintiffs' damages in question.

**B. Count Two: Negligence**

88.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

89.   In addition to and/or in the alternative to the product liability claims asserted herein, Defendants were negligent in the design, manufacture, testing, assembly, marketing, and/or distribution of the Subject Vehicle.

90.   Companies that are in the business of designing, testing, manufacturing, marketing, distributing and selling products are never allowed to needlessly endanger consumers.

91.   Defendants owed a duty to use reasonable care in the design, manufacture, testing, assembly, marketing and/or distribution of the Subject Vehicle.

92.   Defendants failed to use reasonable care when they designed, manufactured, tested, assembled, marketed, distributed and/or sold the Subject Vehicle, and consequently put a product on the market that was unreasonably dangerous for its intended or reasonably anticipated use as discussed herein.

93.   In designing a vehicle, efforts should be made by manufacturers to identify potential risks, hazards and/or dangers that can lead to serious injury or death.

94.   Once potential risks, hazards, and/or dangers identified, then the potential risks, hazards, or dangers should be eliminated if possible.

95.   If the potential risks, hazards, and/or dangers can't be eliminated, then they should be guarded against.

96.   If the potential risks, hazards, and/or dangers can't be eliminated or guarded against, they should at least be warned about.

97.   A company is negligent where the company fails to conduct a proper engineering analysis that would help it to identify potential risk, hazards, and/or dangers that could seriously injure someone.

98.   As noted earlier, most (if not all) engineering associations in the United States (and around the world) have a code of ethics. The number 1 fundamental canon of ethics for almost all engineers is to "hold paramount the safety, health, and welfare of the public."

99.   Accordingly, since paramount means "superior to all others", all vehicle engineers have to hold the safety, health, and welfare of the public as their highest considerations when they design vehicles. Indeed, General Motors, for instance, has admitted under oath that its engineers have and hold paramount the safety, health, and welfare of the public, and/or dangers that can lead to serious injury or death.

100. With respect to the Subject Vehicle, based upon information and/or belief, the Subject Vehicle was not subjected to rigorous engineering analysis.

101. With respect to the Subject Vehicle, based upon information and/or belief, the Subject Vehicle was not properly tested and analyzed to determine what countermeasures were needed to prevent the serious and ultimately fatally injuries complained of herein.

102. Based upon information and/or belief, Defendants either knew or should have known about advanced safety features used in Europe, Australia, Japan or foreign markets and chose not to offer those safety features to American consumers.

103. Defendants' safety philosophy and design philosophy are utilized in various model vehicles and parts, including ones sold in foreign markets.

104. When Defendants designed the Subject Vehicle, Defendants did not reinvent the wheel. Defendants used (or should have used) an enormous amount of human capital which had been acquired from numerous different engineers who had worked on many prior vehicles. This knowledge would have been (or should have been) utilized in different aspects of the designs of the vehicle to make the Subject Vehicle safer in foreseeable accidents such as what occurred in this case.

105. Defendants are currently in exclusive possession and control of all the technical materials and other documents regarding the design, manufacture, and testing of the Subject Vehicle. Defendants are also in possession of what, if any, engineering analysis was performed.

106. However, it is expected that after all these materials are produced in discovery and/or after Defendants' employees and corporate representatives have been deposed, additional allegations may come to light.

107. Lastly, the materials from other models, years, and foreign markets will provide evidence regarding what Defendants knew, when they knew it, and about what was utilized or not utilized as well as the reasons why.

108. The foregoing acts and/or omissions, defects, misrepresentations and/or negligence of Defendants were the producing, direct, proximate, and/or legal cause of the serious and ultimately fatal injuries to the minor child and Plaintiffs' damages.

*C. Count Three: Misrepresentation*

109. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

110. Defendants have misrepresented that safety must come first.

111. Defendants have misrepresented that it has an obligation to protect vehicle occupants in the best way possible should the worst-case scenario arise.

112. Specifically, for decades Mazda has touted the safety of its vehicles.

113. The Subject Vehicle failed to possess all of the state-of-the-art safety equipment qualities that the Defendants have touted for decades.

114. The foregoing acts and/or omissions, defects, and/or negligence of Defendants were the producing, direct, proximate, and/or legal cause of the fatal injuries to the minor child and Plaintiffs' damages.

## VIII. Damages to Plaintiffs

115. As a result of the acts and/or omissions of one or more of the Defendants, Plaintiffs have suffered in the past and will in reasonable probability suffer in the future: mental anguish, emotional distress, sorrow, grief, depression, loss of consortium, loss of companionship and loss of enjoyment of life as a result of the death of J.E.J., their minor son.

116. Plaintiffs would further show that while the accident made the basis for suit occurred on October 8, 2020, their minor son, J.E.J, did not succumb to the injuries suffered in the accident until two weeks later, October 22, 2020. Between the time of the accident and the time J.E.J. succumbed to his injuries, J.E. J. endured conscious

physical pain and emotional pain, torment, and suffering, for which Plaintiffs, as the sole heirs of the body of J.E.J. now sue.

117. As a result of the acts and/or omissions of one or more of the Defendants, Plaintiffs have become obligated to pay reasonably and necessary funeral and burial expenses as a result of the death of J.E.J., their minor son.

118. The above and foregoing acts and/or omissions of one or more of the Defendants, resulting in the fatal injuries to J.E.J., Plaintiffs' minor son, have caused actual damages to Plaintiffs.

## VI. Prayer

119. For the reasons presented herein, Plaintiffs pray that Defendants be cited to appear and answer, and that upon a final trial of this cause, Plaintiffs recover judgment against one or more of the Defendants for:

    a. actual damages;
    b. prejudgment and post-judgment interest beginning October 8, 2020;
    c. costs of suit; and
    d. all other relief, general and special, to which Plaintiffs are entitled to at law and/or in equity, and/or which the Court deems proper.

Respectfully submitted,

**The TRACY firm**

  /s E. Todd Tracy
E. Todd Tracy (Attorney-in-Charge)
State Bar No. 20178650
TTracy@vehiclesafetyfirm.com
Wendall P. Martens, Jr.
State Bar No. 24002528

CMartens@vehiclesafetyfirm.com
Garrett D. Rogers
State Bar No. 24110295
Grogers@vehiclesafetyfirm.com
4701 Bengal Street
Dallas, Texas  75235
(214) 324-9000 – Phone
(972) 387-2205 – Fax

**Attorneys for Plaintiffs**